Fagal Jr v. Marywood University Appellant 18-2174 Tenured faculty at Marywood University were protected by a disciplinary policy designed to function by a series of gradual steps. A policy that's 540 in the appendix. If I could ask you about the policies, there's one from 2010 and one from 2011. And at trial, it looked like the plaintiff offered the 2010 document. Why? I believe that it was offered to deal with the possibility that the court found the operative version of the policy to be ambiguous. The old policy functioned as parole evidence to clarify the meaning of the current policy. But it doesn't get there unless it's ambiguous. But did the offer of proof or anything, would be anything either in the pretrial order or something that would have explained why the 2010 policy was even being offered if the plaintiff's position is it didn't apply? Well, both parties understood throughout the litigation, no one's ever disputed that the operative policy here was the one that we're relying on here. Nobody ever said that the old policy was in effect. So I plan to talk about my colleague's argument about a professor who commits a murder. And I'd like to try and clarify exactly what the relief is that we're looking for here. But I propose to start with the language of the policy. And we believe there's one provision which offers the court the clearest path to defining the university's responsibilities under the contract. And that's in the procedure section under the heading meeting with administrator. At the end of that paragraph, it says that if the professor's explanation doesn't satisfy the administrator, that the administrator, quote, will specify corrective action to be taken. And so whatever else the policy required, it required that. And now, Merriwitch's argument here has been not to dispute that that's a requirement of the policies, but to dispute whether the procedures apply in the first place. But then wasn't there a specification that is notification of suspension, which according to the policy to continue further says a faculty member may be suspended at any time during the proceedings? So that happened. Well, but that's not a specification of corrective action. That's a that's a specification of discipline. But you're assuming that corrective action is always required. That's your position, correct? An opportunity for corrective action. Yes, we're our position is that the contract by its terms has a few things that it requires in every case. It requires this commencement. It requires a meeting with the administrator. And it requires this specific specification of corrective action in every case. Now, there are other things that can that can also happen. But but but yes, our position is is that was required to happen. If we could go earlier in the document where it reads that the policy recognizes personal and professional problems. I'm reading from the first paragraph. Yes. That may a permissive word. Yes. Be rectified by, quote, informal educational process, comma, as well as serious violations. So doesn't this read as if there are two. Bodies of conduct that could be subject to different responses by the administration. Well, and certainly that's the university's argument. But we believe that that argument is not consistent with the with the text of the contract. And let me try and explain why. I think the language you just referred to is important for that. But I think that the most important contractual provision here is the procedure section itself, where there aren't these two different tracks that are laid out. One informal process for professional problems and a second set of procedures. And instead, it's one process. And it's and it's a single process that includes exactly the kind of penalties that that the contract is, that the that the preamble is talking about applying to serious offenses. They may have streamlined the approach from 2010. But if we think of what's laid out here as progressive and we have the provision that you can essentially leapfrog to suspension. And whenever the vice president for academic affairs thinks it's warranted. Why doesn't that and then the next step after that essentially is is dismissal. Why doesn't that just reinforce that the remedial steps in between are in fact discretionary, which which seemed like a finding that the district court was making? Well, let me let me try and answer that this way. The the preamble in the policy says this policy is designed to proceed through a series of gradual steps. And it says that that that it's animated by this view that that discipline is corrective rather than punitive. And so all of this, I think, gets looked at through the lens of those provisions. And what it's saying, the sentence that the judge was referred to. I understand that to be a repudiation of the two track approach that existed in the earlier process. The earlier process explicitly laid out these two separate punishment tracks. And here what this says is because we believe that the role of this process is corrective rather than punitive. We're we're including all of it in the process. And that's why it recognizes both professional problems and and the serious violations. And and and the contrary argument, I think, really struggles against the language of the of the policy as a whole, because the argument that that the university is forced to make is to say, well, there are two tracks and the procedure section is only procedures for the smaller stuff. And there are no procedures that are laid out for the serious violations. That's an argument that they have to make, because once they and that is their position and it has to be their position, because once they accept that the procedures are involved, then they have to recognize the sequencing effect of the procedures that are early in the policy. But later in the policy, there's procedures for when there's a decision to suspend or dismiss. Yeah, that is the convening of the ad hoc committee, et cetera. Yes. So it appears that the policy sets forth steps that are taken that are tailored to the circumstances presented. And that's true. I don't dispute that there are other steps that are involved in this. But but the problem that that the university has with the text is that there's kind of gray area about what steps are required in what situations. But there's one thing that is black and white here, and that is it has to start with this commencement. There has to be a meeting with the administrator. And if the explanation given at that meeting doesn't answer it, there has to be a specification of corrective action. So you said you could you were going to respond to a situation where the circumstances were extraordinarily egregious. Yes. Right. An assault, for example. Your analysis then would be they would the wrongdoer would meet with the alleged wrongdoer would meet with the university. And then there'd have to be a corrective action. So you would you would take away from the university its ability to put out suspend someone who is engaging in assaultive behavior. Well, no, I don't agree with that. It's certainly on in terms of suspending the procedures. It's clear you can suspend at any time. So there's no question about that. The way I would understand the procedures to function in, if that circumstance arose and the accused murdering professor brought an action for breach of contract because he was terminated in the process, he would argue that breached the terms of the contract. They didn't specify corrective action. And and by the terms of the contract, he would be right. That would be a breach of the contract. But in that circumstance, the university would have compelling defenses that they'd be able to offer under Pennsylvania contract law. In particular, they'd be able to argue impossibility. They would argue. Well, there was no action that we could specify that would correct the murder that took place. Well, isn't that by implication what happened here? The university had judged the posting of the video and its contents, measured it against the sort of the guideposts of the university and made a decision. There was nothing short of suspension that could deal with the impact on Mr. Levine and others. Yes, absolutely. And so and and and that's the thrust of their absurdity. The argument is sort of functioning similar to to the impossibility argument that I just laid out. But there's a there's a key difference with the way that the university is trying to use absurdity. The thrust of that argument is not it would be that it would be absurd to apply the policy as written as to these two parties. What they're saying is that there's some other hypothetical application of the contract, the murdering professor. There's some other situation that we can that we can imagine in which it would lead to absurd results. And because it would lead to absurd results in that in that imaginary circumstance. Therefore, we don't have a duty to perform the contract here. Isn't the point that because of the nature and as from their perspective, the way that they've represented it, the egregiousness of the violation of the core values that is akin to that. And the district court found that that the harm that's covered for purposes of suspension doesn't need to be physical harm. Harm to reputation or to the morale of the university. That violation of core values could be sufficient. So is there really such a gap between a hypothetical example and what they allege is as the injury here? Well, I think there is, because if you get away from the idea of the professor commits a murder, then the question that you have is when you've got a professor who's done something like Professor Fagle did here, which obviously and undisputedly, the university recognizes a serious issue. But the question is, is it absurd to think that in that kind of a circumstance that that university discipline, that a discipline policy would apply to that? Why isn't that just a matter of deferring to the discretion of the university as to whether something is or is not remediable? And there we have the language under dismissal that says if remedial actions taken during the suspension does not sufficiently resolve the issues that lead to the suspension, the university may move towards the dismissal of the faculty member. The focus there is conditioned on the resolution. And if the university is making its determination in its discretion, this is not susceptible to resolution. Then having already suspended someone, what what what else would it need to do to satisfy the terms of dismissal and move toward dismissal? Well, what they what they had to do was to specify the corrective action to be taken. And if their position is that there was no no corrective action that was available, then they can offer that as as a defense. And and and and that gets decided. But it gets decided on the terms of as between these two parties, not with respect to to to the to the to the hypothetical murdering professor. And isn't that where we are? I mean, their argument, as I understand it, is the activities here were not susceptible to some kind of remedy. The resolution was not possible. So they suspended and moved toward dismissal because it wasn't simply not remedial from there, from from from their perspective in the exercise of the university's discretion. And what what deference do we owe to that? Well, there's there's no difference. This to the question of their of their having followed the procedures. That's what the Pennsylvania Supreme Court in Murphy. It's clear about that. This is looked at the same way as across this point is what's don't we owe discretion to their judgment that it was a serious enough type violation? That corrective action would have been unnecessary and not even just not even deference to that. But it's under Pennsylvania law. The substantive decision is unreviewable. We're not able to argue, hey, this wasn't really all that big a deal. They shouldn't be allowed to suspend them or they shouldn't be allowed to file. All that we're able to argue is that they didn't follow the procedures. And so they have the procedure there that said they had to specify corrective action. They didn't do it. And the only the only legal hook that they have to to get around the breach of contract on that is to say, well, it would be absurd for us to have to do that. And and I and so and part of my argument here is it's clearly not absurd in a circumstance like this to to. And it's a legal determination whether it's absurd or not to apply. That's not that's not the university's judgment. It's a legal question. Would it be absurd? And so part of my argument is it wouldn't be absurd to apply it in this sort of circumstance. This is in the heartland of the kind of thing that discipline policies apply to. Let's let's not take absurdity out of it and focus on the text of the agreement, which seems to be in permissive terms. Personal and professional problems may be rectified by informal education process. And and then many of the remedial actions are also framed in terms of may. Right. Conceded that suspension is something that they are able to. It appears if you if you think of the procedures as gradual steps, they can leapfrog over the first three of them and go to suspension. If justified, you know, if there's immediate harm, they can do that at any time. And then it's only if if the remedial action taken during the suspension does not sufficiently resolve the issues, they move to dismissal. But as as you just acknowledged, the university makes a judgment about whether it is that there even are remedial actions that could resolve the issues. I just I disagree with that view. I think that the that the language of the contract requires the university to specify remedial actions. Now, if it's impossible for them to do that, if that's their position, then they get then they can fight about that position in court. But they're required to. And there's circumstances where it would be impossible, but it isn't impossible here. And I think a part of the context that I think is helpful for for understanding this is looking at how Pennsylvania law interprets these contracts. We're going to take it just for a short moment because we're over time. All right. They apply the contracts as written. And the notion of avoiding the language because it would lead to absurd results has been an extraordinarily narrow concept under Pennsylvania law. The Third Circuit decision that talks about it refers to a 1963 Pennsylvania Supreme Court decision that has never been cited by by any Pennsylvania appellate court since then. Thank you. May it please the court. Donny English from Marywood University. There's one important finding in this case that's not before this court. And that is the finding that Dr. Fable didn't didn't suffer any damages because he was paid through the end of his contract. And as a result, any remand or any reversal would mean that only one dollar is at issue in this dispute. In this case, beyond this case, a reversal or remand could set a precedent that a university would under these circumstances would have to give a second or third chance for serious harassment by a faculty member. How do you respond to your adversaries point where he jumped us? His first point was go right to the fourth paragraph of the policy statement where it says the administrator, quote, will specify corrective action to be taken. He suggests that's a conditioned precedent to doing anything else. Why is that incorrect? So let's let's take their view of that paragraph. We comply. Even if we look even if we do this and I'll argue later how that why that's an absurd result and why that would actually be illegal for us to give a second, third and fourth chance when somebody has violated Title seven or perhaps a negligent negligent retention claim that we'd be liable for. But if you look at the meeting with the administrator paragraph, it says that if additional light is not shed on the allegation or an explanation is not satisfactory, that's where we are here. The administrator will specify corrective action to be taken. The record is clear that we specify that he would be suspended as a result of his conduct. And he was suspended and we specified that corrective action. Corrective means correcting something that the faculty member did wrong previously or remediating it or preventing future. I don't understand how the suspension is corrective. The suspension might be warranted for immediate harm, but that's how it's talked about in the suspension paragraph, not as being corrective. And I can see that the way it's talked about in this paragraph may not be corrective, but a suspension is clearly a corrective action that can be taken. Let's talk about suspension. Suspensions require immediate harm. The immediate harm referred to in your brief is that Levine was upset and could imagine himself attacking the professor. Where's the immediate harm that Fagle threatened? The immediate harm was that by posting this this video that now it's created a hostile environment. All right. Hostile work environment requires sufficiently severe and pervasive. Now, there's a case or two out there that find maybe one extreme situation could constitute it. But overwhelmingly, it requires a pattern. You haven't pled a pattern for him. Your Honor, we cannot revisit again that substantive determination as to whether or not there was harm, but we can revisit whether the contract was interpreted and applied in good faith. Absolutely, Your Honor. And if we do not see a pattern, then why can we just defer to Levine's expressed desire to have him fired right away, as opposed to something that demonstrates that that was in good faith, a judgment of immediate harm. Your Honor, in the record, there was a pattern that was established. There was a an offensive cartoon about Muslim individuals that he was counseling immediate harm. What in the record shows immediate harm and a finding that immediate harm was satisfied. And I'll go back to your statement that Dr. Levine said when when this video that depicted a nun, the president of the university as Hitler depicted a Jewish faculty member as a Nazi officer and and and directed stereotypes and made fun of his wife and his children. And that we're now expected to to to have that those those individuals work in that environment. I would say that it is severe. It is pervasive. So let's talk about this. My understanding of how to work. It's severe or pervasive. You're talking about severity. Yes, Your Honor. Okay. And then we're trying to link in a pervasiveness or pattern because of some other episode. But the triggering event, as we understand it, is this posting of this video. And it was severe. Is that correct? It was shocking. The entire university was shocked by this. The reputational harm could not be reversed at this stage. It was already out there. The impact to Dr. Levine's family. I think he testified that, you know, he eventually ended up losing his wife over this. This was an issue. And he said he would not have worked in this environment had we not suspended and terminated him. He would have sued us for negligent retention had we given Dr. Fagle a second or a third chance. Maybe you could address your friend's comments over here. Your friend says you you you have not disputed on page seven. You called it an error, albeit a harmless error. But it's the 2011 policy that applies, not the 2010. Yes? Yes, Your Honor. And that 2010, just to answer the original question I think at the outset, was that the 2010 policy was, there was no testimony relating to the progressive discipline policy in the record on that 2010 policy during Exhibit 3. The only it was only offered for purposes of of testimony on the disclosure of confidential information and criteria for removing a tenured faculty member. Now, is your friend correct in characterizing your argument as being that this is still in essence a two track policy and that the procedures laid out from the procedures heading on down are required in non-serious cases but are not required in serious cases? Is that your position? That is that is correct. However, I would bring the document or the procedures that govern serious cases right in the ad hoc section, Your Honor. And that's and that section should not be taken lightly because it's substantial. And so if we go back to the last sentence of the first paragraph that sets out the whole purpose of the policy, as it was pointed out before, there are two tracks. There are tools. We've been describing this as tracks. I like to describe it, I think, a better way to describe it as a toolbox. These are discretionary tools to deal with problems you can fix. So maybe an oral warning, written warning, suspension, and problems that you can't fix. Is it discretionary tools? Yes, Your Honor. Okay. Well, the meeting with the administrator uses the word shall. Shall is not discretionary. Yes, Your Honor, it's not. Okay. It says will specify corrective action. Will is not discretionary. Yes, Your Honor. Okay. Let's go down to the next paragraph. Supervisor Dean must notify the vice president of academic affairs. Must is not discretionary. Yes, Your Honor. Two more lines down. The written warning will become a part of the personnel file. That's not discretionary. Yes, Your Honor. So this is not all discretionary and you don't dispute there was no investigation conducted. There was no meeting with the immediate supervisor or appropriate dean. There was not a series of warnings given. So we have a series of paragraphs that have mandatory language and you're agreeing they were not complied with. I don't agree, Your Honor. In fact, it's just the opposite. There was a meeting with the president. But the meeting is supposed to start well below the president's level. This is supposed to be a gradual escalation. It's supposed to start with the immediate supervisor or appropriate dean and then work its way up to the president. The problem is that dean was Mr. Levine. Okay. And it would have been imprudent to have that dean sit down with Dr. Fagel. Okay. The vice president for academic affairs shall conduct a preliminary investigation. And there was a preliminary investigation. We brought Dr. Fagel in. We obviously examined the video. We gave him an opportunity to explain the video. Counsel, each one of these mandatory terms is in a sentence that's prefaced with the term if. If additional weight is not shed on the allegations, then the administrator will do something. If the alleged problem continues or additional complaints are received, then they shall conduct. Are you relying on that language, that conditional language as part of the contract argument? Absolutely, Your Honor. And Judge Bevis, you referenced the written warning section. It says may. You don't ever have to give a written warning because it says may. And that's only if the problem can be resolved. So the only getting back to your point about what is mandatory, what is mandatory is no matter what. If you move towards dismissal, you get an ad hoc committee review. Two committees to review his termination. But there's some steps we have to get to before they're on page two in the middle. Well, first of all, you don't dispute there's no definition in the policy of what's serious, what's not. You're saying it's entirely up to the university to decide what's serious. Yes, Your Honor. OK, so let's get to page two in the middle. If remedial actions taken during the suspension. Does not suspicion sufficiently resolve the issues, then the university may move towards dismissal of the faculty member. What are the remedial actions taken during the suspension here? So that is under the track one scenario where the university decides that remedial action is even appropriate to begin with. It doesn't say that, but you're saying the dismissal provision is only for non-serious offenses and serious offenses can go to dismissal without satisfying the requirements under the dismissal paragraph. What I'm saying, Your Honor, is under the dismissal paragraph, there's a if there's a progression taken and that progression doesn't work because you've decided to go to to enact progressive discipline and it doesn't work, then you can move towards dismissal. We're not there because remedial action was never was never on the table when he makes a video depicting a nun and a Jewish person as as Nazis. The previous policy expressly drew two tracks. It had two separate headings. Here we have one heading procedures. We have one effective and flexible means of identifying problem areas and we have a series of gradual steps. Now, does your argument all hinge on trying to apply this phrase we're applicable back to everything in that list? No, no, Your Honor. It doesn't hinge. And just back backing up to the 2010 policy. When the when the policy when the contract before us is clear, we can't look at outside of this contract. I think this contract is so clear that we don't need to look at anything else. Your Honor, all you have to do is look at the last sentence of the first paragraph that sets it out. That's what's so clear. And you also concede, by the way, you drafted this this provision, right? The university, the university. And it's part of this contract, right? Yes, Your Honor. So under contra preferentum, if there's an ambiguity, we can stir it in his favor. This has to be clear and unambiguous for for you. And unless it would lead to an absurd result and under Dr. Fagel's reading of the contract. And we talked about a murder or embezzlement or you name it. You would have to you would have to give a second and a third chance before you can correct it. Well, take your friend's absurdity argument on the other side. On your reading, the president can unilaterally decide that she's offended by a faculty member whose views she dislikes or detests and fire them. And then that substantive decision is unreviewable. And all the preceding steps are just in her discretion to skip over. What meaningful review is there if if there's a personality spec? And I'm not saying that's the situation here. I'm imagining a hypothetical scenario in which the president wants to get rid of a tenured faculty member who is a thorn in her side. How does your reading put any teeth into this policy and make it worth the paper it's printed on? Because before we dismiss a tenured faculty member, we have to give him peer review. He got two committees to review his termination that determined unanimously over months, over several months. They and he got paid for all of the stuff in the first page and a half is hortatory. You think it really can. You can jump past the dismissal section and automatically get to the ad hoc faculty committee. If you murder somebody, if you rape somebody, if you make a video. Well, I'm asking how about the thorn in the faculty in the president's side? And I'm not saying that's the situation. Just hypothetically, why isn't your reading absurd? Because there is no the first page and a half has cannot provide any protection to a faculty member. You're a thorn in the side. You can declare immediate harm, suspend the person and jump straight to the ad hoc faculty committee. And that's why exactly why we have the ad hoc faculty committee. A jury of his peers, so to speak, get to determine whether or not the president is just has a thorn in her side, his or her side. So everything in the first page and a half is completely hortatory. There's progressive discipline for issues that can be fixed. And then there's you know, that's like a screwdriver, a verbal warning, whatever. And then there is more serious conduct that would merit dismissal. That's your saw. That's your hammer. There's no definition in here of what's in which camp. There there. Well, I think I think that the if you if you look at the language in the in the second sentence of the first paragraph, it says that the university regards disciplinary action as corrective and not punitive. The policy recognized personal and professional problems that may be rectified by informal education process. An informal education process is not going to undo this viral video. All right. But I just don't. The first page and a half appear to apply to some of these serious ones. The bottom of the first page suspension says if it would be in direct violation of law, you can suspend without pay. Otherwise, it's with when we're talking about violations of law. That sounds serious. At the top of the second page, we have people who are addicted to alcohol, addicted to drugs, mentally ill. And yet you seem to say that's all in a non serious camp that sounds serious, but it's still dealt with at the bottom of the first page and top of the second page. When you're addicted to alcohol or drugs, counseling can fix it. OK, but that doesn't mean it's not serious. It just means it's fixable. It means that it's fixable. OK. And and and I will note that under special assistance and the only time that remedial action is mentioned is in this paragraph before the dismissal section is that's a may also. You don't it's not required either under the special assistance section. The may is from may move toward dismissal. I'm sorry, you're on under the special assistance section under the first. I see what you're saying may require any of the following actions. So that's not even mandatory. Your Honor. I want to understand. And this goes to the standard of review, but but also what what endeavor we're undertaking here. I I gather we're all in agreement that we're we are looking to interpret a contract where we're reviewing the district court's interpretation of that contract. But the premise for many of your answers seems to be that we're limited to the four corners of the contract and that we have to look at the contract as being unambiguous. This was on a 50 U.S.C. motion, right? This was after a bench trial. The district court made a judgment based on findings. Yes, Your Honor. Right. And and those findings were after testimony by numerous witnesses about the the meaning of these contractual terms. Correct. Your Honor, there was testimony as to the meaning of the contractual terms. And so there you go to the whole to the extent that Judge Caputo thought there may have been a latent ambiguity in the contract and that the terms are clear. But perhaps there are other other conflicting language within the contract. He he perhaps heard evidence as to what was the proper what was the the intent or the interpretation by the party. So when we have when we have the district court's findings, for example, that suspension of a faculty member does not require an immediate threat of physical harm, emotional or reputational harm may meet the standard. What what's our standard of review of that of that finding by the district court? It's it would be I would say it would be DeNovo that you would be able to look at the terms of the contract and and you would have to accept the findings of fact in terms of that, that the university's determination that there was, you know, this type of harm. The district court's district court's findings of fact, we we don't review DeNovo. No, you don't. You give discretion. Absolutely. All right. For clear error. Absolutely. On the on the on the factual findings of fact. And how about the finding that Mary would was not required to provide Dr. Fagel with progressive discipline prior to suspension or termination? That is in the findings of fact section. But but I would say that this court can read the four corners of the contract and look specifically at at the first paragraph and the last sentence in that first paragraph. That's a higher burden for you. Right. That is DeNovo review as opposed to review of clear error and clear error standard for the district court's findings. Right. So the findings of fact that that the findings of fact would obviously be be under the much lower, lower standard. And the finding that the policy does not require informal processes for all offending conduct. That would be under the lower standard since it is a finding of fact. I do have just a couple of questions. There was some of the briefing talked about the district court erroneously considering the 2010 agreement. And I think that the only place we see it is like a parallel citation once. Do you read the district court applying the 2010 agreement in the 2011 agreement? I read them applying the 2011 agreement. The language is exactly the same. I think that the citation there was one spot where where Judge Caputo only cites to join exhibit three. The prior policy. We think that that was erroneous, but that that the language is exactly the same. Therefore, it didn't infect the judges. The prison through which the judge was making his determination. There's absolutely no testimony on the 2010 policy on on progressive discipline. I'd like to also ask you if even if the district court was looking at the 2010 policy and you've represented that they're very similar in most material ways. Didn't Dr. Fagle get all the process he was due? There was a complaint filed. He was given notice of it and met with the university's highest level officials, given notice of the consequences of at least from their point of view, a failure to show contrition took many weeks before that video was taken down. He's suspended. He's given. He's invited multiple times by the university to participate in the ad hoc committee review. Finally, he participates. What process did he not receive? And one thing you missed, Your Honor, with all due respect, he got paid for seven months during this whole time. I don't know whether we knew that before you said it. Suspension. We didn't know. And it is one of the findings of facts. So when we talk about it's not somebody that we just said, you know what? You're throwing in our side. You're out of here. Didn't do that. He got paid for seven months. He got two committees to review. He was he got the opportunity to explain himself. He left the video up for five weeks after the meeting with him. So you're from your point of view, there was not there was no error. Therefore, we don't even have to look at harmless error here. No, Your Honor. Thank you. I have a couple of points I'd like to make. First, I want to read from the district court's opinion. Give us a site where you're reading from. I'm looking at page 756 of the joint appendix. Thank you. In the middle of the first paragraph there, where he's describing what the policy requires. And he says, quote, more importantly, the faculty handbook explains that the informal process was not applicable when serious violations of professional responsibility were in question. And the citation in support of that, the this idea that he described is more important is to the old policy. But your adversary represented them materially the same. Do you disagree with that? Oh, I emphatically disagree with that. The old policy said there's there's two different procedures. There's an informal procedure for the small stuff, and there's a formal procedure for the big stuff. But the language is being quoted here appears in both. Well, it there is language that is taken from the old policy and put into the new policy. But it's but it's reframed in the new policy. It's a repudiation of the old policy where it says, because we recognize that the purpose of this is corrective. Therefore, we're including both the small stuff and the big stuff in this policy. Does your I mean, does your argument boil down to the the objection that they needed to specify expressly that no remedies were available?  And that they didn't do it. And that that was that that's the clearest requirement that they have here. University believes that there there is no corrective action. It's possible. What what what is your understanding of what's required under the policy in terms of providing or specifying remedial steps? My understanding is that the policy says this is one of this. This specification of corrective action is one of the things that has to happen. That's what's in the contract. Right. And so and so if there if that's the university's belief that there is none, then we're into the realm of they've reached the contract and they've got affirmative defenses. And by failing to specify. But then you're you're suggesting that in every instance, no matter what the behavior is, there must be a specification of corrective action under the contract. But I mean, I think it's important to qualify that and say, I think that there are lots of circumstances where the university would have a powerful affirmative defense to that, to to address exactly the kind of concern that your honors are referring to. It sounds like it sounds like you're saying the fault on the university's part is that they didn't say in writing or say out loud no remedial steps possible, no corrective action possible. Instead, they acted on it in a way that communicated that implicitly by going to suspension and dismissal. Well, if they've concluded there is no corrective action to be specified, what where do you find in the contract the requirement that that be stated expressly as opposed to implicitly in simply going to suspension and dismissal? Well, my view is that the contract made the decision. The intent of the parties is reflected in the contract and the contract made the decision that this specification is something is an essential step in these gradual steps, an essential step in the disciplinary process. But we can't why we can't infer from the sequence of events in the nature of the conduct that they made the decision. There is none. Well, and this is the argument that this is the point that I'm trying to make. The mechanism by which they do that is not a mechanism that's internal to the contract. The contract says you have to do it every time. The mechanism for them to assert those defenses is an impossibility argument, an absurdity argument, a material breach argument. How could that be, though? According to your view, this is a conditioned precedent to move forward on anything, any further discipline. It says, well, you drew our attention. As soon as you came up to the podium, they have to specify corrective action. Yes. And so the answer to that won't be an affirmative defense. It should be, what can they do next into the contract? And if their behavior reflects none can be taken, they should be able then to proceed to the next step. But that doesn't make it any less of a breach of the contract. But then we'd have to accept your view that in every case there must be a specification of a corrective action. And failure to specify automatically leads to a breach. Yes. And that's just simply a straightforward application of Pennsylvania contract law. And I don't think I'm making a stretch in describing that. Well, the difficulty for you is I understand that Pennsylvania contract law says read plain language. And I read those plain language. But you have to read it in the context of the document in which it's being offered. And if you go eight or nine lines down, which is what I turned to your attention to before, they can suspend at any time. Sure. Which means they don't have to wait for corrective action. They can suspend at any time. Absolutely. But they can't terminate at any time. I mean, that's what's at issue here. Right, they didn't. They went to the ad hoc committee before they went to termination. Well, you terminated before the ad hoc committee. Well, they told him the intention is to terminate. He said, I'm going to take that to the ad hoc committee. And then she said that she finalized the determination. And then the ad hoc committee performed the review. But that's not what I'm disputing. The point that I'm making here is that what the contract provided, what the contract said is this is one of the critical steps in the process. You've got to have this specification. And it wasn't conditioned in any way on the idea that this is a less serious thing or that there was some sort of substantive trigger for this specification of corrective action. There simply was a blanket requirement of the specification of corrective action. Which you're saying has to be stated explicitly. It has to be. If they had said here in the meeting or in writing simply there is no corrective action available, that would satisfy the contract as you interpret it. No, as I interpreted, they're required to specify corrective action. They have to say these are the things that would correct it. When they conclude that there's none available, they need to specify it? No. Then they're breaching the contract and they're living or dying on the affirmative defenses to that breach. But I feel like maybe I'm somehow not being... No, we get it. I think we get it. You're not buying it. Well, I don't know. We'll see. But we do get it. Thank you. Regarding the standard of review and the procedural posture here, which was after a trial and seems to be based on... I mean, there are conclusions of law, but there's also a series of findings that support them. So you argue that the upshot of your brief seems to be that we should engage in de novo review. But what do we do with the findings, including as to what immediate harm means in the contract, for example? Well, we're not disputing the immediate harm. But the answer to the question of what to do with the findings, I read the findings of fact as being essentially restating the conclusions of law. I don't think that there are factual questions, credibility issues, or disputes of fact that are being decided there. I understand the findings of fact here to be essentially factual restatements of the legal conclusions. Once the judge decided that the procedure section didn't apply to serious violations, that was it. That was the dispositive thing. Now, 52C says that if you're going to enter judgment on partial findings, you have to have findings of fact and conclusions of law. But I don't think there were any factual disputes here that the judge was resolving or purporting to resolve. I think that the statements that he made in the factual findings were driven by the legal conclusions and were restating the legal conclusions. All right, great. Thank you very much. Thank you.